18-1111, New York Republican State Committee, et al. Petitioners v. the Securities and Exchange Commission. Mr. LaCour, Jr. for the Petitioners. Mr. Berger for the Respondents. Good morning, Mr. LaCour. Good morning, Your Honor. May it please the Court, Edmund LaCour, here on behalf of the Petitioners. There is no right more basic in our democracy than the right to participate in electing our political leaders. Thus, Congress has always reserved for itself the First Amendment-sensitive task of regulating contributions to candidates for federal office, as never set those limits for state and local officials. And this is fitting for any restrictions on the people's right to influence who will govern them should come from those officials closest and most responsive to the people, not from unelected bureaucrats with no mandate to advance free speech and no expertise in campaign finance. Now, before delving further into the merits, I'd like to say a word about standing. The very purpose of this rule is to restrict the right of thousands of financial professionals from contributing to political candidates. None of them are here. Your Honor, we do have an affidavit from Francis Calcagno. He is one of those people who has been restricted. Sir, he is not a party to the case, but he has. How can he give you standing? Your Honor, because he should. At this moment, you're supposed to come and stand. Yes, Your Honor. You're going to have to look to your group for standing. Yes, Your Honor. We do have to look to the political parties or to their candidates to see if they have been sufficiently harmed. In this instance, there is no doubt that harm has befallen our candidates and the party itself because of this rule. And that is because, again, as the rule was designed to do, it has silenced the speech of supporters of the party and therefore has deprived our candidates of political contributions that Mr. Calcagno would have made otherwise and of fundraising activities that he would have conducted on behalf of the party. This falls squarely into this Court's precedent from taxation with representation, where the Court found that the mere prospect that the elimination of a tax deduction for contributors to the nonprofit would be sufficient to give that nonprofit standing because it would be less likely for their supporters to then give money to the nonprofit. Here, we're not even talking about likelihood. We have the actual harm that has already befallen the party when Mr. Calcagno refrained from giving to the New York GOP's candidate for governor, Marcus Molinaro. That is a textbook, pocketbook harm to the party and to its candidates, and that is more than enough to confer standing in this case. If the Court has no further questions about standing, I'd like to address the merits then. Turning first to the statutory argument, the SEC argues that the Exchange Act's general grant of authority to regulate manipulative practices and to promote a free market allows it to create campaign finance law for those participants in that market. But as this Court held when construing the Federal Power Act's similarly broad and generic grant of authority to FERC, there is not an infinitude of acceptable definitions for such a generic grant of authority. Thus, even when an agency's ends may be permissible, the Court must scrutinize whether Congress has decided to grant the authority or grant that particular tool to the agency to carry out its ends. Here, there is no reason to think that the SEC has been given the authority to regulate political speech. That's because such regulations always involve weighing two important interests, the need to combat corruption and the need to respect First Amendment rights. As the Supreme Court has repeatedly advised, legislatures are the experts when it comes to striking this delicate balance between those two interests. The SEC may be the experts in free markets or in corruption in the markets, but they have no similar expertise when it comes to the other equally or even more important interests. So your argument would also invalidate the Investment Advisors Act Rule of 2010 and the MSRB Rule G37? Your Honor, we do think that the logic of our argument would apply to those two rules as well. I'd also like to point out those are the only two other instances that we are aware of where an agency has deemed it fit for them to regulate campaign finance, which I think is a knock against the SEC's statutory arguments here. In the, I guess it's called Blount case, Blount case, Yes, Your Honor. in addressing the First Amendment argument, not the authority argument, the Court seemed to say things that are equally applicable to the authority question here with respect to the authorization that the SEC has with regard to protecting markets from corruption and manipulation. Your Honor, I think it's important to recognize the distinction between whether the SEC is furthering its permissible ends and the means that it's using to do so. So when you look at a case like FDA v. Brown and Williamson, there's no question that the FDA was promoting public health when it regulated tobacco products and nicotine. But Congress said that this is such a large, this is such an important question of political and economic significance that we simply don't think Congress handed that over to the FDA to regulate back in 1938 when it passed the FDCA. And we think that that reasoning applies a fortiori here where we have a question not only of political and economic significance, but constitutional significance as well. And so when you look at Blount, I mean, Wouldn't that all have been true in the Blount case as well? It would have been, Your Honor, but the statutory argument was not presented there. Correct. But what the Court said that might bear on the statutory argument was that, quote, the link between eliminating pay-to-play practices and the Commission's goals of, quote, perfecting the mechanism of a free and open market, close quote, and promoting, quote, just and equitable principles of trade, so close quote, is self-evident. Correct, Your Honor. We don't dispute that. So you would have us say that, yes, let's take the Blount case on its own. Apart from this, you would have us say, yes, the statute authorizes this. Pardon me. Nothing implementing this statute violates the First Amendment because what the rules are doing is clearly authorized by the statute in the other case and narrowly tailored so as not to infringe the First Amendment, but are nonetheless not authorized here, indeed are arbitrary and capricious here. Your Honor, I... It's a difficult sell. I mean, it requires us to basically disavow what we said in the Blount case, doesn't it? I don't think it does, Your Honor, because while there was a debate in Blount as to whether the MSRB in that instance had properly struck the balance between corruption and the First Amendment rights of members of the MSRB, there was no debate that very serious First Amendment interests were implicated by the rule, which I think... Implicated but not transgressed. That was the Court's holding in the case, yes, but to employ the constitutional avoidance canon of construction, you don't have to actually find that there has been a constitutional violation in order to do so, and moreover... Wait a minute. I didn't catch that. In order to avoid the constitutional issue, we would have to find... No, Your Honor, when reading a statute, courts will employ a constitutional avoidance canon without actually... The whole point of constitutional avoidance is to avoid having to get to the constitutional issue, so I think constitutional avoidance could still apply here because there is no question... I'm following what you're saying, but just to be sure, you're saying that we should not get to the constitutional question. We should say that this is an invalid action on the statutory ground? Yes, Your Honor. It wasn't self-evident to me why you were bringing the constitutional avoidance up. Clearly, you're right on that. We would not reach the constitutional issue if we don't have to, indeed, if we can avoid doing so. Correct. Right. But I'm just saying we're dealing here with a statute. You're calling into question the Commission's authority to cover this field of activity under its statute. That's correct. We've already said that there's a self-evident connection between pay-to-play and the authority given in the statute. You're right. You said it in a different context, in the First Amendment context, but how do we set that aside now or disregard it now? I think there is a similarly self-evident connection that the FDA could have pointed to in Brown and Williamson, that they were called upon to promote public health, and clearly regulating cigarettes to keep them out of the hands of children was going to self-evidently promote that interest. But the problem was that Congress had never delegated that authority to the FDA in the first place. Well, there was something odd about delegating the authority to the FDA, which is about health-protective products, and nobody has ever argued that tobacco is such. But in any event, back to this area, isn't it more telling of Congress's intent that Congress did revisit the question in view of the MSRB rule and actually expanded the MSRB's rulemaking authority in view of its existing action, including the pay-to-play rule, and viewed that as a baseline for rulemaking with respect to municipal advisors? And that's quoting from the Senate report. So if Congress thought, no, no, this is not a power that we expected the financial regulatory entities to be wielding, we would have expected at least some debate on that, no? Two responses, Your Honor. First, we have one snippet of legislative history that the SEC points to and that you just referred to, that an act of Congress. Now, of course, Dodd-Frank did expand MSRB's authority, but there was nothing explicit in Dodd-Frank that suggested that the pay-to-play rules were going to go along with that. But moreover, I think this is the last instance where we would expect Congress to reach out and try to reel back in the SEC for the very reason that when this rule applies to any federal election, it's almost always going to have an incumbency-protecting effect, which is, again, a very serious First Amendment problem as well, but I think it does bear at least some of the statutory question. You don't really think we can base the reasoning and opinion on that, do you? I think we're going to have an opinion that says we're not going to trust Congress because of the incumbency-protecting tendency of limitations. You don't have to base the opinion on that, Your Honor, but I think this Court and the Supreme Court have both cautioned against relying on congressional silence, particularly when you're dealing with a very— Now, the difference between congressional silence and a reenactment that comes and broadens, even in this instance, in the face of a binding court decision, it's not simply the silence of a new statute. That is, the momentum of Congress of reenacting the same or an even greater authority in agencies, knowing that the courts have held that the authority is up there. It's not the same, is it? Your Honor, there is a distinction there. Now, I'm the first to say we should not put too much stuff in congressional history, or congressional silence in the terms of congressional history. When the silence is talking about it, it's the change that Congress had to change things and didn't take. That's a bit different, isn't it? That would be a bit different, Your Honor. I mean, the other argument we have as to why the Exchange Act could be different from that particular amendment to the MSRB's authority is there is this proviso in the Exchange Act that expressly tells FINRA not to regulate matters that are not related to the purposes of the Act. And if you look at what FINRA does, they're essentially — But you've more or less conceded that this is related, and that's the argument that you make in analogizing this case to Brown and Williamson, that that's just not enough. And I thought that Judge Ginsburg's point about the reasoning in Blount also shows us that, yes, it's related to the objectives of the Act. And your point is, well, that's not enough. The purposes of the Act and the matters of the Act could be two different things, Your Honor. I think matters would be more along the means that are used to pursue those purposes. So if they enacted something that had nothing whatsoever to do with clean markets, then, yes, that would fail. You wouldn't even need the proviso to do any work in that instance. But if we're looking — if it does indeed limit the means that FINRA is able to deploy, well, let's look at what FINRA does. And FINRA is to broker-dealers what, like, a state bar is to lawyers. So they deploy what's the equivalent of the bar exam. And they have continuing education requirements. And disclose this to your client, and here's how you handle confidential information. They've never until a couple years ago claimed the ability to regulate the political speech of their members. And that's because that is not a matter that is related to what FINRA does, what FINRA has done for 80 years when Congress first gave it this sort of authority back in 1938. So what we have is this sort of long, dormant power to regulate political speech that has suddenly sprung forth more recently. And in the interim, what we've seen is Congress acting multiple times in the campaign finance realm with very specific and very careful attention to First Amendment and corruption balancing. Let me just ask you on the — back on the standing point that you introduced at the outset. It's curious that you don't have a member of the New York Republican Party with an affidavit. And so could you just trace for us — I gather your strongest evidence is Colcagno. And even though he's not a member of either of the plaintiff parties, he attests that he would have bundled in fundraising for the New York Republican Party, but that he's not able to do that given the rule, and therefore that that harms the party, because presumably the argument is that his bundling would have reached donors in New York that would — or donors loyal to the New York Republican Party that would have better supported him. Is that — am I getting the — Yes, Your Honor. He works in New York for Pickwick Partners. He lives, I guess, across the river in New Jersey. But I think his fundraising efforts, whether done from his home in New Jersey or from his office in New York or from California or from wherever, would still be just as beneficial as that of a good native New Yorker. So I don't — while the fact that he is a member of the New Jersey party might make it more difficult for us to establish an associational standing on his behalf, but I still think we do have good arguments that he could be considered a member — You don't need to raise an eyebrow as to why you couldn't come up with somebody from New York. Yes, Your Honor, I'd like — New York's got a lot of people in it, and a lot of them work in the financial industry. Yes, Your Honor, well — And none of them are Republicans? First, Your Honor, no, there are many Republicans in New York, Your Honor. 2.8 million voted for the New York — or for the GOP's presidential candidate in 2016. And to your point as to why we don't have a dozen affidavits, why we only have one, it's understandable, and — You don't even have one. You don't even have one from anybody in New York. We have one from a donor. One, the person has donated in the past, would have donated in 2018, will donate in the future if this court sides with petitioners here. Moreover, as to why we don't have any New Yorkers who have submitted an affidavit — But that doesn't mean that he's a member of your association for associational standing purposes. Sir? He's not a member of your association for associational standing purposes. He's not a New York Republican. I'm not certain that that would be the case. If he supports the party with his time and his money, I think he could be considered a member, but —  He does not, Your Honor. But ultimately, I do think that's irrelevant because of the fact that there are these pocketbook harms to the party, and associational harms as well, because we can't associate with him, at least in this fundraising capacity, because of Rule 2030. You also argue, just to correct me if I'm wrong, or he attests in his declaration at paragraph 8 that if Rule 2030 didn't apply to him and his employer, he would contribute more than $350 to several New York GOP candidates. Wouldn't that be because he's not eligible to vote for them? Wouldn't that be $150? Your Honor, he'd be willing to do both. I think $350 is above $150. So either way, the rule is constraining him. It's an odd way to put it if the relevant limitation to him is $150, right? It is, Your Honor. Okay. And he doesn't attest that he's ever done that soliciting of contributions from others for candidates in the past. He just says that he would do that. I believe that's correct, Your Honor. I see I've gone over my time. I'd like to reserve the remainder for rebuttal if I have any. We'll give you time for rebuttal. Thank you. Thank you. Good morning, and may it please the Court. Jeff Berger for the Securities and Exchange Commission. Rule 2030 is a response to pay-to-play involving FINRA members who help investment advisors obtain contracts from state and local governments, namely pension funds, an unfair business practice that distorts markets and harms the beneficiaries of those pension funds. The Commission, as I will discuss, had authority to approve Rule 2030, which is constitutional under this Court's precedent, but it's our view that this Court should not reach those issues because petitioners lack standing. And I think one way to frame the standing argument is to look at what came before in this case. The 11th Circuit dismissed one of the parties, which is no longer in this case, for lack of standing and said that there's no reason not to submit the evidence that the Court discussed in that case. So I think one way to look at this is to ask, what is different now than was different then when the 11th Circuit dismissed on standing? And I think what you have is you have an expanded affidavit from a party official, but what it is lacking is the crux of the issue in standing here, which is that Rule 2030 regulates placement agents, regulates FINRA members firms. It doesn't regulate political parties. There is no issue in terms of direct contributions to political parties from Rule 2030. Put another way, a member firm or one of its covered associates can contribute directly to a political party, such as the New York GOP, without the timeout interfering with that. There is no restriction on that. So the idea that they are receiving less money, the party is receiving less money because of Rule 2030 doesn't track what the rule actually does. Well, except that there's a cost for them if they want to act as a placement agent within the next two years. There's a deterrent on them. There's only a deterrent in terms of contributions to officials, not to the party. The rule specifically does not include... But bundling for the party? There is a bar on bundling, and I'd like to turn to that, because I think what is missing in the affidavit is crucial evidence, which is, one, what is the effect of bundling? How does that actually translate to actually lost dollars? And the reason why it's important goes to the tailoring of the rule. The bundling prohibition affects placement agents at the time they are, in essence, soliciting contracts on behalf of investment advisors. So it is a narrow window in which the bundling prohibition would take effect. So to the extent that there is harm from that, at the moment, based on the evidence that's been provided to this Court in the affidavits, it's strictly conjectural or speculative. There's not even information in the affidavits about whether, in this election cycle, the party obtained less money than it has in previous election cycles as a result of the rule. Do we require that level of detail at the threshold in our standing analysis, however? It is a summary judgment standard, Your Honor. I mean, whether it requires that in this particular type of case, I don't know how many other cases there are exactly like this, but it does. I'm sorry. No, continue. It does require a level of specificity sufficient to pass some judgment. In my view, the evidence being provided here is far too general. And in large part, that tracks the fact that there are no affidavits from actual injured members here. In a moment, you will be relying on that Blount case on the merits. I will. Does Blount not hurt you on standing? Is it not cathartic, the proposition that? No, it does. I'm sorry, Your Honor. Go ahead. It does not. It does not hurt us on standing in principal part because William Blount was the petitioner in that case. He was a regulated, not an entity, but a regulated member. He was, in effect, a municipal securities dealer. So if. Is part of the reason why there are no New York placement agents as plaintiffs in this case, I'm just obviously just inferring and you would be too, but if this rule were invalidated, Rule 2030 were invalidated, then under the Advisors Act rule from 2010, placement agents would be forbidden unless they are also, unless they happen to be investment advisors. In other words, that rule, I thought, restricted the use of placement agents unless they were regulated equivalently or more stringently to the investment advisors in that, that were covered by that rule. Sure, and if I can answer Your Honor's question by just moving slightly backwards in time, the commission, when adopting the Advisors Act rule, or when considering the Advisors Act rule back in 2009 and 2010, had initially proposed banning placement agents entirely so that it would basically eliminate an entire market. The commission heard back from placement agents, from advisors, even from state and local pension funds saying, please don't do this. Pension funds do serve a good, excuse me, placement agents do serve a good purpose. There are some, have been some bad incidents that have tarnished it, but overall they serve a good in terms of markets and investors. So what then the commission decided was instead of barring placement agents, it would place them under the guise of pay-to-play rules that would be adopted by SROs like FINRA and the MSRB. The MSRB one, of course, already existed. So yes, it's a little bit odd. It's an odd feature of standing here, which is the political parties purporting to advocate on behalf of placement agents are advocating for the removal of a provision that would harm placement agents because they would not be able to in effect serve as placement agents for investment advisors to state and local government agencies. Unless they themselves were investment advisors. Unless they, and then yes, complying. Right. So it would actually put a certain subset of them out of business. Yes. But the party has a different interest because the party obviously benefits from pay-to-play. The more people have to ante up because they think that's going to be a qualification for them in getting business, yeah, it might harm the party. So but why then isn't Colcagno the perfect affiant for the party here in the sense that, I mean, it stands to reason that individuals who are eager to do bundling would benefit the party. And you're saying, well, we don't really know that. It's conjectural. Well, it's pretty commonsensical that disabling people who are loyal to a party from bundling in its behalf would lower the contributions. If I can answer why Colcagno is not the perfect affiant here, and let's just start with the fact that he's not actually a member of the New York party. But let's assume for the moment he was a member of the New York party. There's two issues with his affidavit, and this completely goes to what the affidavit doesn't say. One is he talks about that he would bundle in the future, but he never attests that he actually has ever bundled in the past. So that's one. And then two, it relates to the link between, and this is the crux of the world, the link between the government entity, the official of that government entity, and the member firm. And I view Colcagno's affidavit as very, and the Cox affidavit for that matter, as very, very carefully saying that Colcagno's firm has served as a placement agent. But he does not at any point say that it has served or will serve as a placement agent for New York. And that is crucial for this rule because the rule, as a result of its tailoring, requires a link between the government entity and the official. The only thing the rule is trying to stop in terms of pay-to-play are officials with contracting authority for advisors. And New York, in particular, is a unique state in the following way. The pension fund, the New York State pension fund, which is enormous, I think almost $30 billion in assets, is controlled solely by the comptroller, which is an elected position. So a placement agent seeking to help an advisor gain a contract from the pension fund could give to the governor because the governor is not an official as to the pension fund, only the comptroller is. Now, that's not to say the government could, excuse me, the governor could never be an official because New York State, exclusive of the pension fund, could hire placement agents, on behalf of investment advisors. But we don't know if that actually happens. We don't know if Pickwick is involved in that because there's no evidence providing the affidavits to that effect. So to me, this is not a case where standing is impossible to show. There are certainly those cases out there where it's just not the right type of plaintiff. This is an evidentiary failure, and it's an evidentiary failure that happened before the Sixth Circuit. It just recently happened before the Eleventh Circuit and has been repeated here. And one of the places that the party tries to close that gap is by referring to specific support for Molinaro. But you're saying Molinaro is also not a covered official? What I'm saying is he may or may not be. It depends on whether, in terms of the specific contributor or member firm, whether that member firm is actually providing placement agent services to the government of New York, not the pension fund. So, I mean, the government has money from tax receipts, from other things, and they may or may not hire investment advisors, and placement agents may or may not serve as a middleman to help investment advisors get those contracts. But I don't know, and this Court doesn't know, whether Pickwick or CalCogno has any role in that because they haven't said so. Is that easy for people in the financial services industry to discover? If I'm someone in CalCogno's situation, I want to know who I can bundle for or fundraise for. How do I find out what the lines of responsibility are? With all respect to Mr. CalCogno, this about the comptroller and about the New York pension fund, this is widely known within the financial industry. The pension fund, but you also said you didn't know whether Molinaro is a covered official because that would depend on whether New York is employing the services of placement agents. Let me restate. What I'm saying is I don't know whether Molinaro is a covered official for purposes of a contribution from Pickwick because I don't know whether they have served as a placement agent for New York. Molinaro would be a covered official writ large, but what I'm saying is the tailoring of the rule, the requiring of a mixing, or not a mixing, but a nexus between the person with contracting authority and the broker-dealer who wants to engage in pay-to-play is the essence of the rule. It's a feature rule. It's not a bug. I would like to talk about the merits a little bit, but I don't want to cut off any standing questions. If there's no more, if I could just move to the merits. First, I want to answer Judge Ginsburg's question because I do think the logic, the rationale, in Blunt does bear on the authority question here as well as, of course, the constitutionality question. And one reason is the statutory authority underlying Rule G37, which comes from Section 15B of the Exchange Act, is almost word-for-word the same as the statutory authority that's underlying the rule here in Section 15A. That's the authority that controls rules that FINRA must have for broker-dealers. The language is very, very similar. So, yes, I do think Blunt bears very much on the authority question, obviously the constitutionality question as well. And I do think it's important to talk about Brown v. Williamson because I think it provides actually a very nice contrast with what happened in this case. As I understand Petitioner's argument, Petitioner's argument is basically the commission has veered far outside of its lane. And my response to that is, well, the commission, in terms of starting with Rule G37, has been in this lane for almost 25 years. And Congress has not acted to remove the commission from its lane, despite having multiple opportunities to do so in either the campaign finance laws or the securities laws. But it actually expanded the lane in Don Frank when it not only gave the MSRB more authority over community advisors, but specifically pointed to pay-to-play laws. And I understand that this is in legislative history, and legislative history is not the text. I understand that, but it is a factor to look at, and it is important to look at. And then we can contrast with Brown v. Williamson, which does also look at sort of the history, the legislative history, not just text, but also what happened in the Supreme Court in that decision. I mean, it spends almost 15 pages talking about a 70-year history of Congress telling the FDA, you have no business dealing with tobacco. Now, it didn't have an express preclusion clause, but it talked about testimony, legislative reports, all these things where the FDA, Congress has basically told the FDA, this is not, you can't play in this sandbox. And the FDA is agreeing. They're saying, we have no authority over tobacco. So the court's looking at that, and that is a complete contrast with what has happened here in terms of what the aid. What about Galeano, where we really emphasized how there's a very delicate balance under the Federal Election Campaign Act that, you know, it seems structurally somewhat at odds with that to say that the commission can just come in sidewise and restrict more conduct than the commission, than the Federal Election Commission has done. Yeah, I mean, I think there's two aspects of Galeano to talk about. One is I do think Galeano is distinguishable, and in part is distinguishable because the issue there was, in essence, dueling administrative litigation over a single solicitation, I think a mailer. And part of that had a lot to do with the fact that the FEC is given exclusive authority to regulate FECA, meaning the name requirements that were at issue in Galeano. But also there's a procedural component. The FEC has this very intricate conciliation process designed to sort of stop things before they become court cases. That's very different in this situation. The commission isn't seeking to hold anyone liable for a contribution that somehow exceeds FECA, nor does the rule somehow allow contributions of a FECA. One would only violate the rule by accepting compensation in the wake of a contribution. Now, that's not to say that somehow that doesn't mean the First Amendment or contributions aren't implicated, but what the commission is focused on is halting the pay-to-play, not the contribution. Firms always have a choice of what they can do. Now, for a firm that gets 100 percent of its revenue from placement agency services, it's not much of a choice, and then we can go back into the Galeano and First Amendment analysis. But for a firm that doesn't actually do much in placement agents or maybe has some speculative hope years from now to become a placement agent, the choice becomes a little bit more reasonable, and they may choose to make contributions. I do just think Galeano on the procedural element is a different case. I also think on the substantive matter it's a different case because what that was dealing with was, in essence, was avoiding a situation where the litigant's a wrong term, I guess either a PAC or a candidate, is forced into a position of having to comply with FEC requirements and then be all of a sudden in a position where, despite their compliance with the FEC's name requirements, that it's somehow also then violating a postal fraud, a more general postal fraud provision. I do also just two more things about — I'm sorry, I'm actually over my time. Can I finish a thought about Galeano? Just two other things about Galeano. I do think some of the reasoning in Galeano has to be contrasted with the reasoning in Palm, which is a more recent unanimous Supreme Court case. I do think those two cases have to be juxtaposed. And reconciled, thank you. All right. We'll hear from Mr. Laqueur. Thank you. Mr. Laqueur, do you have time remaining? We'll give you two minutes for rebuttal. Thank you, Your Honor. I'd like to address just a couple of points that Emma from the other side had brought up. First, one important thing to recognize about the rule is the way the two-year timeout really has sort of a pernicious, chilling effect on anyone who is even involved as a broker-dealer. They may not have a hot lead on getting business with a particular government at that moment, but if they want to keep their options open for that sort of work, they cannot make those sorts of contributions or they will be frozen out for two years. I mean, if you imagine a similar ban applying to a large law firm that would freeze them out from government contracting work for two years, not a single associate is going to be allowed to participate in the political process. And we have letters from the Financial Services Institute that are in the record at JA156 that say exactly that. There is no way for us to operate while allowing our employees to engage in the political process, because we don't know when these sorts of opportunities are going to arise. So I don't think that presents any standing problem for us whatsoever. And this is, again, how the rule was intended to work. It has had that effect. My friend from the other side also brought up a vagueness problem that it's not always clear which candidates are even going to be covered or not covered. There's no list that's published by the SEC or FINRA. There's relatively little guidance even. So, again, it makes sense for these financial professionals to exercise great caution lest they get knocked on the door from the SEC one day and find that they have— You haven't made a vagueness argument as such, have you? Not like a straight first-amend vagueness argument, but I do think it bears on the standing question. There is some, in terms of tailoring, there is some leeway for errors to be excused on a limited basis, if somebody does. If someone makes one contribution and then they find out, if one of your employees from the entire firm makes an impermissible contribution and they get it back within, I think, 60 or 90 days, then they are given sort of a pass that one time. But for large firms, I think you're maybe allowed two passes over the course of a year or two. And for small firms, only one. So the risks are still very high. You refer to associates, but in the rule, associates are actually quite limited. It's not associates in a law firm associate sense. It's general partners, managing members, or executive officers that are covered. And placement agents. And placement agents themselves. Not everyone at any given broker-dealer necessarily, but it's still very important for the left hand. The left hand isn't always going to know what the right hand is doing, and therefore these employers tend to take a very conservative approach. Finally, I'd like to just touch on Galeano if I have just one moment. Like you said, there is a very fine balance at issue there. At least as this rule applies in the federal context, I do not see how they can be reconciled. They do not complement each other unless you ignore the fact that campaign finance rules not only try to curb corruption, but also try to preserve a certain level of First Amendment activity for citizens. And the SEC again, all you have is a hammer, every problem looks like a nail, and when all you regulate is markets, all you're going to care about is corruption. Thank you so much.
judges: Pillard, Ginsburg, Sentelle